**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Conserve Southwest Utah | ) | |
| 321 North Mall Dr., B202 | ) | |
| St. George, UT 84790 | ) | Case No. 21-CV-1506 |
| | ) | |
| Conservation Lands Foundation | ) | |
| 835 E. 2nd Ave. #314 | ) | |
| Durango, CO 81301 | ) | |
| | ) | |
| Center for Biological Diversity | ) | |
| 378 N Main Ave. | ) | **COMPLAINT FOR DECLARATORY AND** |
| Tucson, AZ 85701 | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| Defenders of Wildlife | ) | |
| 1130 17th Street NW | ) | |
| Washington, DC 20036 | ) | |
| | ) | |
| Southern Utah Wilderness Alliance | ) | |
| 425 East 100 South | ) | |
| Salt Lake City, UT 84111 | ) | |
| | ) | |
| The Wilderness Society | ) | |
| 1801 Pennsylvania Ave. NW | ) | |
| Suite 200 | ) | |
| Washington, DC 20006 | ) | |
| | ) | |
| WildEarth Guardians | ) | |
| 301 N. Guadalupe St. #201 | ) | |
| Santa Fe, NM 87501 | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of the Interior | ) | |
| 1849 C St., NW | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| Bureau of Land Management | ) | |
| 760 Horizon Drive | ) | |
| Grand Junction, CO 81506 | ) | |
| Defendants. | ) | |

**INTRODUCTION**

1.      This case challenges the decision of the Defendants U.S. Department of the

Interior and Bureau of Land Management granting a right-of-way for a new four-lane highway—

the so-called Northern Corridor Highway—through the Red Cliffs National Conservation Area

and Mojave desert tortoise critical habitat, together with related decisions to modify and amend

two governing land use plans.

2.      In 2009, Congress created the 45,000-acre Red Cliffs National Conservation Area

(Red Cliffs NCA) to protect its world-class ecological, scenic, wildlife, recreational, cultural,

historical, natural, educational, and scientific resources.  42 U.S.C. §460www ("Omnibus Public

Land Management Act" or "Omnibus Act").  Congress required that Bureau of Land

Management (BLM) "shall" limit uses in the Red Cliffs NCA only to those uses that would

"conserve, protect, and enhance" these resources.  *Id.* at § 460www(e).

3.      On January 15, 2021, then Secretary of the Interior David Bernhardt approved the

issuance of a right-of-way to allow the Utah Department of Transportation to construct, operate,

and maintain the Northern Corridor Highway across 2.37 miles of federal public lands within the

Red Cliffs NCA, including public lands containing the densest concentration of Mojave desert

tortoise—a species protected under the Endangered Species Act (ESA)—in the entire region.  At

the same time, Secretary Bernhardt also approved two land use plan amendments to allow the

Northern Corridor Highway on federal public lands.

4.      Secretary Bernhardt's approvals run headlong into the management mandates of

Omnibus Act, together with our Nation's bedrock environmental and cultural resource laws,

including the Land and Water Conservation Act of 1964, National Environmental Policy Act

(NEPA), and National Historic Preservation Act (NHPA).  Indeed, Defendants acknowledge that

the Northern Corridor Highway will adversely impact the conservation, cultural, and recreational resources within the Red Cliffs NCA.

5.      In addition, the Northern Corridor Highway right-of-way is sited immediately over, through, and adjacent to numerous land parcels that BLM acquired with almost $20 million from the Land and Water Conservation Fund for conservation, endangered species habitat protection, and recreation purposes.  Yet, Defendants never examined the impacts of the Northern Corridor Highway on many of these parcels; and Utah Department of Transportation's planned highway violates the express conservation purposes informing these acquisitions.  As a court recently held, when lands are acquired using monies from the Land and Water Conservation Fund, they must be managed according to the purposes for which they were acquired, and an agency cannot permit a use inconsistent with the acquisition purposes. *Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, *10 (D. Ore. July 3, 2014).

6.      Defendants similarly ignored the direct, indirect, and cumulative impacts of the Northern Corridor Highway on local population growth, noise and other factors; and they never considered the overlapping and cumulative impacts on desert tortoise populations and habitat together with recent fires and other anticipated development in the Red Cliffs NCA.

7.      Secretary Bernhardt approved these actions over the objections of the Hopi Tribe and local, regional, and national conservation groups, which repeatedly raised concerns regarding the inadequacy of BLM's consultation over the adverse impacts of the Northern Corridor Highway on cultural and historic properties, and inadequate environmental analysis. Indeed, in his haste to approve the Northern Corridor Highway, Secretary Bernhardt violated the NHPA by approving the Northern Corridor right-of-way without first minimizing and mitigating the acknowledged adverse impacts on cultural and historic resources.  In fact, the federal

Advisory Council on Historic Preservation—the federal agency charged with implementing the

NHPA—concluded BLM's NHPA compliance was "flaw[ed]."

8.      Secretary Bernhardt's hasty approval of the Northern Corridor right-of-way and

associated actions threatens irreparable environmental and other harms by Defendants' unlawful

actions, and Plaintiffs seek such emergency, preliminary, or permanent injunctive relief as

necessary to forestall such irreparable harms and protect the public interest pending adjudication

of their claims.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 (federal question).  This Court also can provide relief under 28 U.S.C. § 2201 (declaratory

judgment), 28 U.S.C. § 2202 (injunctive relief), and the Administrative Procedure Act, 5 U.S.C.

§§ 553, 702, and 706 (APA).

10.     The challenged agency actions are final and subject to judicial review pursuant to

5 U.S.C. §§ 702, 704, and 706.

11.     Plaintiffs have exhausted all required administrative remedies prior to filing this

lawsuit.

12.     Venue in the District of Columbia is appropriate under 28 U.S.C. § 1391(e)(1)

because Defendant U.S. Department of Interior is an agency of the United States with its primary

offices located in Washington, D.C.; two Plaintiffs are headquartered in this District, and three

other Plaintiffs have offices here; and a substantial part of the events and omissions at issue

occurred in this District, including Secretary Bernhardt's approval of the right-of-way and

issuance of the amended land use plans.

## PARTIES

13.     Plaintiff CONSERVE SOUTHWEST UTAH (CSU) is non-profit organization based in St. George, Utah, working to protect the natural resources and quality of life in Washington County, Utah through direct advocacy of conservation and of Smart Growth policies that enable conservation, for the benefit of present and future generations.  CSU promotes a vision of vibrant, compact communities, anchored in high-tech, tourism, and outdoor recreation industries, which prioritize conservation and stewardship of land, air and water resources for the long-term sustainability of both these natural resources and the communities.  CSU has about 2,500 members and supporters, many of whom live near and recreate in Red Cliffs NCA on a regular basis.  Since its inception in 2006, CSU has been a leader in engagement on public lands conservation in southwest Utah, especially in the Red Cliffs NCA.  In addition to advocacy, CSU staff has spent thousands of hours and organized thousands of volunteer hours to benefit Red Cliffs NCA on the ground, including invasive species removal, litter pick-up, trail maintenance, habitat restoration, and archaeological site stewardship.

14.     Plaintiff CONSERVATION LANDS FOUNDATION, Inc. (CLF) is a non-profit organization headquartered in Durango, Colorado.  CLF's organizational purpose is to promote environmental conservancy through assisting the National Landscape Conservation System (also known as the National Conservation Lands) and preserving open space and wilderness.  Upon information and belief, CLF is the only non-profit in the country specifically dedicated to establishing and safeguarding National Conservation Lands under the care of the BLM.  To fulfill its purpose, CLF works to protect, restore, and expand the National Conservation Lands— including the Red Cliffs NCA-—through education, advocacy, and partnership.  CLF maintains regional offices in the District of Columbia and five states.

15.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (Center) is a non-profit corporation headquartered in Tucson, Arizona, with staff and members living and working in Utah. The Center also has an office in Washington, D.C.  The Center has approximately 1.7 million members throughout the United States and the world.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and environmental law.  Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for us all.   The Center has worked to protect the threatened desert tortoise for well over 25 years through constructive comments on project proposals and land use plans, recovery efforts, and when necessary, litigation.

16.      Plaintiff DEFENDERS OF WILDLIFE (Defenders) is a national non-profit conservation organization with more than 1.38 million members and supporters.  Defenders is headquartered in Washington, D.C., with offices throughout the country.  Defenders focuses in particular on conserving and recovering wildlife species that are listed under the ESA or otherwise recognized as being of conservation concern.  Defenders has a consistent track record of working on Mojave desert tortoise conservation issues for well over three decades.  Defenders advocates for the Mojave desert tortoise in multiple ways, including through scientific research, engagement in land management planning processes, engagement with solar energy projects proposed in Mojave desert tortoise habitat, and petitions to government agencies for heightened conservation protections.

17.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (SUWA) is a non-profit organization based in Salt Lake City, Utah. SUWA also has offices in Washington, D.C.; Moab, Utah; and Chicago, Illinois.  It has more than 15,000 members from all 50 states and several foreign countries.  SUWA's mission is the preservation of the outstanding wilderness and other sensitive public lands at the heart of the Colorado Plateau.  SUWA advocates for proper management of these lands, and the associated natural and cultural resources, in their natural state for the benefit of all Americans. SUWA promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation Systems or by other protective designations where appropriate; and builds support for such initiatives on both the local and national level.

18.     Plaintiff THE WILDERNESS SOCIETY (TWS) is a non-profit corporation incorporated and headquartered in the District of Columbia with approximately 136,000 members.  TWS' mission is to unite people to protect America's wild places.  Its goal is to ensure that future generations will enjoy the clean air and water, wildlife, natural beauty, opportunities for recreation, and spiritual renewal that pristine forests, rivers, deserts, and mountains provide.  For more than three decades, TWS has worked to protect wilderness character lands in Utah.  Since 2009, TWS has been actively engaged in the resource management planning process for the Red Cliffs NCA, including meeting with BLM more than 30 times.

19.     Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit organization headquartered in Santa Fe, New Mexico that is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the West.  Guardians has more than 7,000 members.

Guardians advocates for public land management that protects wildlife and their habitat,

including the Red Cliffs NCA to protect the Mojave desert tortoise.

20.    Plaintiffs each bring this action on their own behalf, and on behalf of their

members, staff, and supporters who live and work near the Red Cliffs NCA.  Plaintiffs'

members, staff, and supporters enjoy viewing and studying wildlife, and recreating in natural

environments that they know are inhabited and sustained by diverse wildlife, including the

Mojave desert tortoise.  Such members, staff, and supporters derive recreational, scientific,

aesthetic, inspirational, educational, and other benefits from such use.  These uses include hiking,

camping, trail running, mountain biking, appreciation of archaeological resources and natural

quiet, journaling, birdwatching, ecosystem research, and photography.  They regularly enjoy Red

Cliffs NCA for these uses and plan to continue doing so.

21.    These uses are incompatible with construction and use of the Northern Corridor

Highway through the heart of Mojave desert tortoise habitat in the Red Cliffs NCA as approved

by Defendants.  The Northern Corridor Highway harms Plaintiffs and their members, staff and

supporters, because the highway will destroy wildlife habitat and vegetation and diminish their

use and enjoyment of the area, and because they are concerned with protecting the wildlife,

plants, scenery, and other natural values of the Red Cliffs NCA, as well as its archeological and

cultural resources.  Plaintiffs' members, staff and supporters also enjoy using federal public

lands that are wild and not burdened by development such as roads, invasive species, unnatural

structures, and other human developments that mar the landscape, create noise and pollution,

fragment and degrade wildlife habitat, and generally detract from a quality natural experience.

22.    Plaintiffs and their members, staff and supporters, as well as their children,

grandchildren, and future descendants, will be significantly and irreparably injured by the

construction and operation of the Northern Corridor Highway.  On behalf of their members, staff

and supporters, Plaintiffs seek to protect the wildlife, scenery, and other natural values of the Red

Cliffs NCA from the direct, indirect, and cumulative impacts of the Northern Corridor Highway

so that they can continue using and enjoying the area.

23.     All Plaintiffs suffer an injury-in-fact because they have all devoted time, energy,

and money to protecting public lands and wildlife, and advocating for only responsible

management of the Red Cliffs NCA.  Plaintiffs have diverted resources from other efforts to

pursue their missions and have instead used those resources to submit public comment to the

BLM, file administrative objections, and engage with local, state, and federal officials about their

concerns with the Northern Corridor Highway.

24.     Defendants' violations of the Omnibus Act, Land and Water Conservation Fund

Act, NEPA, NHPA, APA, and other laws in adopting the challenged decisions have injured and

will continue to injure Plaintiffs' recreational, aesthetic, scientific, educational, spiritual,

conservation, commercial, informational and other interests, and the interests of their staff,

members, and supporters.  These are actual, concrete injuries caused by Defendants' legal

violations, for which judicial review and the relief requested is required to redress.  Plaintiffs

have no adequate remedy at law.

25.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is a federal

agency responsible for managing about 500 million acres of federal public lands across the

United States.  The Department of the Interior, through its sub-agency BLM, is charged with

managing the public lands and resources in Red Cliffs NCA, and decides whether to approve

activities necessary for road construction on land it administers, including rights-of-way and

amendments to resource management plans that allow rights-of-way.  Secretary Bernhardt acted

on behalf of the Department of Interior in approving the Northern Corridor right-of-way and land use plan amendments challenged here.

26.     Defendant BUREAU OF LAND MANAGEMENT is a federal agency within the Department of the Interior.  BLM is responsible for managing the Red Cliffs NCA, conducting NEPA and NHPA assessments and procedures, and deciding whether to approve the Northern Corridor Highway right-of-way and related activities such as road construction and Resource Management Plan amendments that allow rights-of-way.

## LEGAL FRAMEWORK

### A.     Omnibus Public Land Management Act of 2009

27.     In March 2009, Congress passed and President Obama signed the Omnibus Public Land Management Act.  Pub. L. No. 111-11, 123 STAT. 991 (2009).  Among other provisions, the Omnibus Act created the Red Cliffs NCA.  42 U.S.C. § 460www.

28.     The Red Cliffs NCA includes a total of approximately 44,725 acres of public lands in Washington County, Utah.

29.     Congress designated the Red Cliffs NCA to "conserve, protect, and enhance for the benefit and enjoyment of present and future generations the ecological, scenic, wildlife, recreational, cultural, historical, natural, educational, and scientific resources of the National Conservation Area."  42 U.S.C. § 460www(a)(1)(a).  Congress also designated the Red Cliffs NCA to protect "each" endangered or threatened wildlife species located within it, including the Mojave desert tortoise.  *Id.* § 460www(a)(2).

30.     Congress directed that the Secretary of the Interior "shall" manage the Red Cliffs NCA "in a manner that conserves, protects, and enhances the resources of the National Conservation Area," and Congress directed that the Secretary "shall only allow uses of the

National Conservation Area that the Secretary determines would further" the statute's underlying

conservation and cultural purposes, described above. *Id.* § 460www(e).

**B.     Land and Water Conservation Fund Act of 1964**

31.     The Land and Water Conservation Fund Act became law on January 1, 1965.  54

U.S.C. §§ 200301–310; Pub. L. No. 88-578.  The purposes of the act are:

> to assist in preserving, developing, and assuring accessibility to all citizens . . .
> such quality and quantity of outdoor recreation resources as may be available and
> are necessary and desirable for individual active participation in such recreation
> and to strengthen the health and vitality of the citizens of the United States by (1)
> providing funds for and authorizing Federal assistance to the States in planning,
> acquisition, and development of needed land and water areas and facilities and (2)
> providing funds for the Federal acquisition and development of certain lands and
> other areas.

Pub. L. No. 88-578.  In enacting this statute, Congress sought to facilitate the preservation,

development, and accessibility of outdoor recreation resources by providing funds "for the

acquisition of land, water, or an interest in land or water within inholdings within . . . areas [that]

are primarily of value for outdoor recreation purposes."  54 U.S.C. § 200306(a)(2)(B)(i)(II).

32.     The Land and Water Conservation Fund consists of state-side and federal-side

acquisition programs.  The state-side program provides matching grants to the States and local

governments for the acquisition and development of public parks, outdoor recreation areas, and

facilities.  *Id.* § 200305.  Acquisitions funded through the state-side program must remain in

recreation use in perpetuity, unless the Secretary of the Interior approves the conversion of the

land to another use, and acceptable replacement lands are substituted.  *Id.* § 200305(f)(3).

33.     The federal-side acquisition program represents the principal source of funds for

federal acquisition of land. *Id.* § 200306.  The statute provides that "unless otherwise allotted in

the appropriation Act making them available," appropriations from the fund for federal purposes

are to be allotted by the President for certain activities.  *Id.* § 200306(a)(1).  These activities

include land acquisition in recreation areas administered by the Secretary of the Interior for recreational purposes; land acquisition in national park, national forest, and national wildlife refuge system units; and land acquisitions that foster access to federal land for recreational purposes.  *See id.* § 200306.

34.     Lands and interests in lands acquired through the federal-side acquisition program must remain in Federal ownership, and—unlike the state-side program—there is no allowance for "converting" or using acquired lands for purposes other than those for which they were acquired.  *Compare id*. § 200305(f)(3) (explicitly permitting conversion of state-side acquisitions), *with id.* § 200306 (federal-side program) (including no reference to permitting conversion to other uses in the federal-side program).  *See also id.* § 200303(c)(3) (requiring that funds expended "shall be consistent with the requirements for recreational public access for hunting, fishing, recreational shooting, or other outdoor recreational purposes").

35.     The purposes guiding the acquisition of lands through the federal-side program "control[] not just the initial acquisition of the lands, but the manner of their development post acquisition."  *Perez*, 2014 WL 3019165 at *10.

C.     **National Environmental Policy Act**

36.     NEPA is the Nation's basic national charter for protection of the environment. *See* 40 C.F.R. § 1500.1(a).[1]  NEPA's twin aims are: (1) to foster informed decision making by

---

[1] On July 16, 2020, the Council on Environmental Quality issued a Final Rule amending its NEPA regulations, found at 40 C.F.R. Parts 1500-1508.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020) ("CEQ Final Rule").  The CEQ Final Rule became effective September 15, 2020, and applies to any NEPA process begun after September 14, 2020.  An agency may choose to apply the regulations to ongoing activities and environmental documents begun before September 14, 2020.  Here, BLM applied the Council on Environmental Quality's NEPA regulations in place at the time the NEPA process was initiated through publication of the Notice of Intent on December 5, 2019.

requiring agencies to consider the environmental impacts of their proposed actions; and (2) to ensure that agencies inform the public that they considered environmental concerns. 42 U.S.C. § 4331; 40 C.F.R. § 1500.1. To accomplish these goals, federal agencies must prepare an Environmental Impact Statement (EIS) to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

37.     An EIS must take a hard look at the environmental impacts of a proposed action before reaching a decision and "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1; 42 U.S.C. § 4332(C). An EIS must also "[r]igorously explore and objectively evaluate all reasonable alternatives" and explain why other alternatives were eliminated from detailed study. 40 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(C)(iii), (E).

38.     NEPA requires that an EIS analyze the "direct effects, which are caused by the action and occur at the same time and place," as well as "indirect effects, which are . . . later in time or farther removed in distance, but are still reasonably foreseeable" and cumulative impacts, which are those resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. §§ 1508.7–1508.8.

39.     To fulfill NEPA's public participation goals, federal agencies must assess and consider comments both individually and collectively and properly respond to comments in a final EIS. *Id*. §§ 1502.9(c), 1503.4(a). If an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts[,]" an agency must issue a supplemental draft and final EIS. *Id*. § 1502.9(d).

40.    At the time of its decision, an agency must release a "record of decision" that identifies and discusses all factors that the agency balanced when making its decision and state how those considerations entered into its decision.  *Id*. § 1505.2.

**D.    National Historic Preservation Act**

41.    NHPA, 54 U.S.C. §§ 300101–320303, formally recognizes historic preservation as an important policy of the United States.  Section 106 of the NHPA seeks to protect America's heritage in part by requiring federal agencies to take into account the effects of their "undertakings" on historic properties.  *See* 54 U.S.C. § 306108; 36 C.F.R. § 800.1(a).

42.    The Section 106 process entails four basic steps.  First, the responsible agency must "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is a type of activity that has the potential to cause effects on historic properties."  *Id.* § 800.3(a).  An "undertaking" is any "project, activity, or program . . . requiring a Federal permit, license or approval."  *Id.* § 800.16(y).  A "historic property" is "any prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register [of Historic Places]" ("National Register").  *Id.* § 800.16(l)(1); 54 U.S.C. § 300308.

43.    Second, if the agency undertaking has the potential to affect historic properties, the agency must define the Area of Potential Effects for the action.  36 C.F.R. § 800.4.  The NHPA regulations define the Area of Potential Effects as:

> the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties . . . The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

*Id.* § 800.16(d).

44.    Third, the agency must make a "reasonable and good faith effort" to identify historic and cultural properties within the Area of Potential Effects.  *Id.* § 800.4(b)(1).  This

effort "may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.* § 800.4(b)(1).

45.     Fourth, if the agency finds that eligible properties are present in the Area of Potential Effects, it must assess whether the proposed undertaking may cause adverse effects on the identified historic properties, in coordination with consulting parties.  36 C.F.R. §§ 800.4(d), 800.5.  The definition of "adverse effect" is broad: "An adverse effect is found when an undertaking *may* alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1) (emphasis added).

46.     An important part of this so-called "Section 106" review process is consultation with the appropriate State Historic Preservation Officer (SHPO), Native American tribes, and other interested parties, such as Plaintiffs.  The Section 106 process concludes with an agency determination of "adverse effect" or "no adverse effect." *See id.* § 800.5(d).

47.     If the agency reaches an "adverse effect" finding, it must notify all consulting parties and invite their views to assess adverse effects. *Id.*  If adverse effects cannot be resolved, the process is elevated again to the Advisory Council on Historic Preservation and the head of the agency undertaking the action. *Id.* § 800.7.  Until this process is complete, the undertaking in question cannot go forward.

48.     An agency may use the NEPA process to comply with Section 106 in lieu of separate procedures set forth specifically for Section 106 consultation if the agency has notified in advance the State Historic Preservation Officer and the Advisory Council, and meets consultation and analysis requirements. *See id.* § 800.8(c).

49.     Importantly, if during the preparation of its NEPA analysis the agency concludes that the effects of the undertaking on historic properties are adverse, the agency shall develop and adopt measures to avoid, minimize, or mitigate such effects. *Id*. § 800.8(c)(4).

### E.     Administrative Procedure Act

50.     The APA governs judicial review of agency actions and provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The APA directs courts to "hold unlawful and set aside agency action . . . found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions must also be set aside if made "without observance of procedure required by law." *Id.* § 706(2)(D).

## FACTUAL BACKGROUND

### A.     Red Cliffs National Conservation Area

51.     In March 2009, Congress passed and President Obama signed the Omnibus Public Land Management Act. 123. STAT. 991. Among other provisions, the Omnibus Act created the Red Cliffs NCA, which is comprised of approximately 45,000 acres of BLM-administered surface acres, 2,631 acres of private lands, and 13,735 surface acres owned by the State of Utah in south-central Washington County. *Id.* § 1974(a)(1).

52.     The Red Cliffs NCA is located in Washington County in the southwestern corner of Utah. BLM administers approximately 629,000 surface acres of public lands in Washington County, and these lands are located at the convergence of the Mojave Desert, Great Basin, and the Colorado Plateau. The intersection of these distinct bio-regions creates unmatched cultural, geologic, and ecological diversity.

53.     As illustrated on the map below, residential and rural residential subdivisions,

light industrial areas, commercial and retail businesses, and Interstate 15 abut the southern,

western and eastern boundaries of the NCA.



Red Cliffs National Conservation Area (NCA)

54.     Vegetation communities within the Red Cliffs NCA includes mostly desert scrub,

which ranges from a sparse, mostly bare ground surface to a moderately dense layer of evergreen

or drought-deciduous, broad-leafed shrubs and/or succulent species adapted to a desert

environment.  Populations and communities of nonnative, exotic invasive species (including

cheatgrass) are coming to dominate some areas within Red Cliffs NCA.

55.     Red Cliffs NCA contains nearly 200 miles of non-motorized trails for hiking,

mountain biking, horseback riding, and geocaching, and the NCA includes two designated

Wilderness areas (Cottonwood Canyon and Cottonwood Forest wildernesses) within its

boundaries.  In FY 2019, the Red Cliffs NCA had nearly 190,000 visits comprising more than

60,000 visitor days.

56.     The Red Cliffs NCA and public lands in this area also provide important habitat for imperiled native species, like the Mojave desert tortoise, Gila monster, southwestern willow flycatcher, and dozens of bats, songbirds, and other migratory and non-migratory birds.  The Red Cliffs NCA contains nearly 50,000 areas of designated critical habitat for the Mojave desert tortoise.

**B.     Mojave Desert Tortoise**

57.     The Mojave desert tortoise is a long-lived, slow-growing tortoise found across portions of four states to the north and west of the Colorado River, including southwestern Utah, northwestern Arizona, southern Nevada, and southeastern California.  Mojave desert tortoise take 13 to 20 years to reach sexual maturity, and their reproduction and growth increases during years with higher precipitation.

58.     Tortoise home range varies depending on sex, location, available resources and weather patterns; male home ranges can be as large as 220 acres and female home ranges may be as little as half that size.  During droughts, desert tortoise forage over larger areas, and in a lifetime an individual tortoise may use more than 1.5 square miles for habitat, and may occasionally venture more than seven miles outside of its home range on long-distance forays.

59.     Tortoises seek shelter during unfavorable conditions in dug-out burrows, rodent or other animal burrows, and caliche caves; and Mojave desert tortoise may remain inactive during periods of drought.  The availability of shelter sites is an important aspect of habitat suitability, and tortoise use these burrows—even when active—during the night and the hottest part of the day.  An individual Mojave desert tortoise uses an average of 7–12 different burrows within their home range.

60.     Typical tortoise habitat is characterized by scrub brush below 1,677 meters (5,500

feet), where precipitation ranges from 5–20 centimeters, and relatively high diversity of perennial plants.  Mojave desert tortoise are selective herbivores.  Their diet generally consists of herbaceous perennials and winter annual plants, and they are known to forage on grasses, shrubs and cacti.  Mojave desert tortoise prefer native plants over nonnative plants, so a diet composed of mostly nonnative annual grasses—like cheatgrass (*Bromus tectorum*)—does not promote growth of hatchling tortoises.

61.     Current threats to Mojave desert tortoise include loss, disturbance, and fragmentation of habitat from construction projects such as roads, housing and energy developments, conversion of native habitats, and off-road vehicles.  Wildfire increasingly threatens Mojave desert tortoise populations and habitat because it degrades or eliminates habitat.  Following wildfire, native plant species are often replaced by invasive, non-native species (including cheatgrass), which results in long-term habitat degradation or loss.

62.     Moreover, roads increase the spread of nonnative plant species, which is known to reduce desert tortoise forage quality and increase the risk of fire within tortoise habitat.  Road vibration, noise, and lights also have potentially significant effects on desert tortoise behavior, communication and hearing.

63.     The placement of roads through tortoise habitat is well understood to harm tortoise by influencing movements and behaviors, fragmenting habitats, and causing direct mortality.  The breadth of this impact is a function of the size and frequency of use of the road: the bigger the road and the heavier its traffic use, the greater the direct and indirect impacts of the road on Mojave desert tortoise.

64.     Recent studies have shown that the magnitude of this indirect impact—*i.e.*, the road impact zone—can extend out from a 2-lane to 4-lane highway to between 2,150–4,250

meters (7,054–13,944 feet). This zone of impact increased significantly with increasing traffic

levels.  Tortoise populations have been found to be depressed for up to 4.6 km (2.86 miles) from

a roadway.

65.     In 1990, the U.S. Fish and Wildlife Service (FWS) designated the Mojave desert

tortoise a threatened species under the ESA. *Endangered and Threatened Wildlife and Plants;*

*Determination of Threatened Status for the Mojave Population of the Desert Tortoise*, 55 Fed.

Reg. 12178 (Apr. 2, 1990).  The term "threatened species" means "any species which is likely to

become an endangered species within the foreseeable future throughout all or a significant

portion of its range."  16 U.S.C. § 1532(20).

66.     In 1994, FWS designated critical habitat under the ESA for the Mojave desert

tortoise, including six critical habitat units.  The Red Cliffs NCA and surrounding area are

included within the Upper Virgin River Recovery Unit (UVRRU), which encompasses 54,600

acres including 46,098 acres within the Red Cliffs NCA.  Although the UVRRU is the smallest

recovery unit in the Mojave desert tortoise's range, FWS considers this recovery unit of high

importance to the range-wide status of the species due to its high population densities of tortoise.

67.     FWS divided the UVRRU into 11 geographic analytical units, based on known

tortoise occurrences and likely barriers to movement.  Five of these analytical units encompass

the Red Cliffs NCA, including the Snow Canyon, West Cottonwood, East Cottonwood, Babylon,

and small portions of the Cinder Knolls Analytical units.  The East and West Cottonwood Units

are the biggest of these five analytical units.

68.     Threats within the East Cottonwood analytical unit include roads, the potential for

development on non-Federal lands within the Red Cliffs NCA, poor habitat connectivity,

invasive grasses, and wildfire.

69.     In 2014, a range-wide Mojave desert tortoise population estimate identified a

decline of almost 125,000 adult tortoise over a 10-year period, which represents a nearly 37%

overall population decline.  Tortoise populations within the Upper Virgin River Recovery Unit

experienced a 24.3% decline over this same timeframe.  Densities of tortoise in the UVRRU are

declining at a rate of 3.2% per year.

70.     The area in and around the Red Cliffs NCA experienced an even more stark

population decline of 41% between 1999–2019.

**C.     Land Acquisitions within the Red Cliffs NCA and Desert Reserve**

71.     For more than 20 years, the Department of Interior has funded the acquisition of

land within the Desert Reserve (as described *infra*) and the Red Cliffs NCA to protect Mojave

desert tortoise habitat, recreation, and open space.

72.     BLM has used the Land and Water Conservation Fund to acquire fee title or an

interest in land (e.g., conservation easement) on at least 15 separate parcels, totaling

approximately 832 acres, for a total outlay of nearly $21 million.  The stated purpose for each

parcel acquisition was to protect desert tortoise habitat and outdoor recreation within the Red

Cliffs NCA.

73.     FWS has also funded acquisition of lands in and around the Red Cliffs NCA using

federal dollars available through the Cooperative Endangered Species Conservation Fund, which

is authorized through Section 6 of the ESA.  16 U.S.C. § 1535.  Since 1997, FWS has funded the

acquisition of approximately 7,516 acres of private in-holdings within the Desert Reserve by the

State of Utah, mostly on the eastern and western portions of the Red Cliffs NCA.

74.     From 2004 to 2017, the State of Utah Division of Wildlife Resources received

total payments from FWS totaling $15,841,725 through the ESA Section 6 grants to acquire

habitat for the Mojave desert tortoise and other species in and around the Red Cliffs NCA.

75.     Under the Cooperative Endangered Species Conservation Fund, the State of Utah must manage each parcel consistent with the objectives of the acquisition, which requires Utah to manage these lands as "a wildlife preserve for the desert tortoise and other wildlife biodiversity species, . . . and for limited, controlled public access for wildlife viewing."  U.S. Bureau of Land Management & Fish and Wildlife Service, *Final Environmental Impact Statement to Consider a Highway Right-of-Way, Amended Habitat Conservation Plan and Issuance of an Incidental Take Permit for the Mojave Desert Tortoise, and Proposed Resource Management Plan Amendments, Washington County, UT* (Nov. 2020) at 3-94–3-95.

**D.     1995 Washington County Habitat Conservation Plan and Incidental Take Permit**

76.     In December 1995, Washington County Commissioners submitted to FWS a Habitat Conservation Plan for the management of Mojave desert tortoise habitat within Washington County (1995 Habitat Conservation Plan).  The conservation measures and strategy in the 1995 Habitat Conservation Plan were intended to preserve and protect portions of Mojave desert tortoise habitat within Washington County, while at the same time allowing growth and development on other portions of tortoise habitat in the county.

77.     The central element of the 1995 Habitat Conservation Plan was the creation of a 61,022-acre Red Cliffs Desert Reserve in Washington County (Desert Reserve).  Inside of the reserve boundaries all management actions placed the desert tortoise as the highest priority, while outside the Desert Reserve development of desert tortoise habitat was allowed in certain areas.  FWS considers the Desert Reserve a fragile cornerstone of the Upper Virgin River Recovery Unit.

78.     At the time, approximately two-thirds of the lands within the Desert Reserve were

owned by BLM or Utah State Parks, and the 1995 Habitat Conservation Plan adopted a strategy to acquire the remaining one-third to provide continuity in habitat.  A central acquisition strategy was to use the Land and Water Conservation Fund to acquire private and municipal lands for outdoor recreation, wildlife habitat, and threatened and endangered species preservation.

79.     The 1995 Habitat Conservation Plan created five so-called Management Zones, subject to different rules and regulations concerning habitat protections and other conservation measures.  Under this plan, Zone 3 was to be managed for the conservation and enhancement of the Mojave desert tortoise, with associated restrictions or prohibitions on livestock grazing, camping, mineral withdrawal, and vehicle travel.

80.     The 1995 Habitat Conservation Plan contained other measures designed to minimize "take" of tortoise, including education, translocation, heightened law enforcement presence in the reserve, fencing and other measures.

81.     In 1996, FWS issued an Incidental Take Permit for the 1995 Habitat Conservation Plan, which allowed development to occur in desert tortoise habitat on non-federal lands in Washington County.  In the Incidental Take Permit, FWS authorized the "incidental take"[2] of an estimated 1,169 desert tortoise, 12,264 acres of desert tortoise habitat, and 31,282 acres of potential desert tortoise habitat on non-federal lands over a 20-year timeframe.  The Incidental Take Permit included an expiration date of March 14, 2016.

**E.     BLM's 2016 Resource Management Plan for Red Cliffs NCA**

82.     In December 2016, after a six-year public planning process, BLM approved the

---

[2]   Under the ESA, "take" is defined as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect [a listed animal species,] or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).  "Incidental take" is defined by the ESA as take that "is incidental to, and not the purpose of, carrying out an otherwise lawful activity."  16 U.S.C. § 1539(A)(1)(b).

Red Cliffs NCA Resource Management Plan.

83.     This plan approved a series of management decisions, including (a) managing resources to protect and enhance water, geologic, paleontological, vegetation, wildlife, cultural, and scenic resources, while providing for varied recreational opportunities; (b) ensuring ecological integrity of the native vegetation communities is conserved, protected, and restored; (c) managing habitats for federally listed threatened or endangered species so that they are conserved, protected, and restored to support viable populations; (d) managing the open spaces, natural aesthetics, and scenic vistas of the Red Cliffs NCA so that they are protected for social, economic, and environmental benefits; and (e) managing land use authorizations that further the purposes of conservation, protection, and enhancement of resource values in the Red Cliffs NCA.

84.     The resource management plan also directed BLM to acquire non-federal lands within the Red Cliffs NCA to further the area's conservation goals, including "prioritiz[ing] the acquisition of non-federal lands or interests in critical tortoise habitat."

85.     In addition, the plan adopted a series of so-called avoidance and exclusion areas within the Red Cliffs NCA.  An exclusion area is not available as a location of a right-of-way under any condition.  In avoidance areas, BLM must apply heightened protections before locating a right-of-way.  Among other things, BLM must consider options for routing or siting a right-of-way outside the NCA, ensure consistency of the right-of-way with the established purpose of the NCA, and authorize new rights-of-way only when the construction and operation of the right-of-way would not result in the take of federally-listed species.

86.     The plan designated the entire Red Cliffs NCA as a Special Recreation Management Zone, which is an area where the existing or proposed recreation opportunities and

recreation setting characteristics are recognized for their unique value, importance, or distinctiveness, especially when compared to other areas used for recreation.

87.     The resource management plan divided the Red Cliffs NCA into four Recreation Management Zones, including large portions of the so-called "Front Country" zone.  The Front Country Recreation Management Zone is designed to foster high-quality, sustainable non-motorized recreation opportunities, while conserving and protecting other resource values of the Red Cliffs NCA.  The Front Country Recreation Management Zone is designated for hiking, biking, and horseback riding on easily accessible trails and rock-climbing close to the urban interface.

88.     In the plan, BLM specifically rejected Washington County's proposed alternative designating a new utility and transportation corridor that could accommodate a concept highway. According to BLM, this "northern transportation route" would not satisfy the conservation purposes of the Red Cliffs NCA for many resource values, including threatened and endangered species, cultural resources, scenic qualities, and recreation uses.  BLM concluded that this route would create significant adverse impacts on these resources.

89.     FWS agreed with BLM's conclusions, and concluded that "the proposed northern transportation route is inconsistent with the [1995 Habitat Conservation Plan] and NCA because the construction and operation of a multi-lane highway would have significant negative impacts to desert tortoise, their habitat, and the ecological functioning of the Red Cliffs Desert Reserve." According to FWS, the impacts from a northern transportation route would include increased road-kills, habitat fragmentation, invasive species and fire, human access, predation, and increased noise, which would have "substantial negative impact on the desert tortoise population stability and viability within the Red Cliffs Desert Reserve."

**F.      Initiation of Right-of-Way Decision Process and Draft EIS**

90.      On September 18, 2018, the Utah Department of Transportation submitted to

BLM an application for a right-of-way grant for the Northern Corridor Highway to be located in

Zone 3 of the Desert Reserve and Red Cliffs NCA.  Utah Department of Transportation's

proposed Northern Corridor right-of-way route is nearly identical to the northern transportation

route right-of-way that BLM rejected in the 2016 resource management plan and runs right

through the most important high-density cluster of desert tortoises in the entire recovery unit.

91.      On December 5, 2019, BLM and FWS published a notice of intent to prepare an

EIS to review Utah Department of Transportation's application and associated decisions, and

opened a public scoping period.  BLM received 17,258 submissions from the public during the

scoping period—mostly in opposition to the Northern Corridor Highway.  Plaintiffs submitted

detailed scoping comments, requesting increased protection for the conservation and cultural

resources protected under the Omnibus Act, and proposing a series of reasonable alternatives to

the Northern Corridor Highway.

92.      In June 2020, BLM and FWS issued a Draft Environmental Impact Statement,

and sought comment on their proposed alternatives.  BLM's proposed action was to issue a 30-

year renewable right-of-way grant to the Utah Department of Transportation for the construction,

operation, and maintenance of the Northern Corridor highway across BLM-administered lands.

According to BLM, the right-of-way would be up to 500-feet wide and would accommodate a

four-lane highway with two 12-foot-wide travel lanes in each direction, 8-foot shoulders, and a

20-foot median.  In addition, the Northern Corridor Highway would also include a 10–14-foot-

wide trail; communications infrastructure; curbs and gutters, drainage swales, and ditches; and

would be posted with a 50-mile per hour speed limit.  The Northern Corridor Highway would

include at least three major interchanges and intersections, and Utah Department of

Transportation's alignment would be approximately 4.3 miles long, of which 2.37 miles would

cross BLM lands.[3]

93.     The Draft Environmental Impact Statement considered five alternatives to the

proposed Northern Corridor right-of-way, including: two alternative routes within the Red Cliffs

NCA (T-Bone Mesa alignment and Southern alignment), two alternatives using existing highway

and road infrastructure (Red Hills Expressway and St. George Boulevard/100 South One-way

Couplet (Couplet Alternative)), and the no action alternative.

94.     In addition, the Draft Environmental Impact Statement examined a series of

alternatives for the interrelated and interdependent actions amending the 2016 Red Cliffs NCA

Resource Management Plan and St. George Field Office Resource Management Plan.  Regarding

the 2016 Red Cliffs NCA plan, BLM identified a no action alternative (which would bar issuance

of the right-of-way for the Northern Corridor Highway); and two alternatives that would modify

the existing 2016 plan to allow for the issuance of the right-of-way.

95.     BLM also considered three alternatives to modifying the St. George Field Office

Resource Management Plan, including the no action alternative, and two alternatives that would

create a so-called Zone 6 to be included in the 2020 Washington Country Habitat Conservation

Plan for management as a mitigation area for desert tortoise.

96.     The Draft Environmental Impact Statement also included FWS's proposal to issue

an Incidental Take Permit to Washington County that would authorize the take of Mojave desert

tortoise under the 2020 Habitat Conservation Plan, discussed *infra.*  The Draft Environmental

---

[3]  At different times, BLM and FWS describe the Northern Corridor Highway as crossing either
1.9 miles or 2.37 miles of BLM lands.

Impact Statement considered only two alternatives—one alternative denying Washington County's request, and a second alternative adopting and approving Washington County's Habitat Conservation Plan and requested Incidental Take Permit.

97.     The agencies received nearly 15,500 public comments on the Draft Environmental Impact Statement, which raised a host of concerns over the impacts of the proposed action on the world-class resources in the Red Cliffs NCA.  In particular, Plaintiffs supported the Red Hills Expressway and Couplet Alternatives, noting that Washington County's proposed Northern Corridor Highway fails to protect, conserve, and enhance the resources for which Congress created the Red Cliffs NCA; harms desert tortoise habitat and population; runs afoul of acquisition purposes under the Land and Water Conservation Fund and Section 6 of the ESA; and undermines cultural resource protections on the Red Cliffs NCA.

### G.     Recent Fires in Red Cliffs NCA

98.     In summer 2020, four wildfires burned nearly 15,000 acres within the Red Cliffs NCA, including the Turkey Farm Road Fire (11,995 acres), Cottonwood Trail Fire (1,623 acres), Snow Canyon Fire (800 acres), and Lava Ridge Fire (348 acres).  These fires consumed almost 9,000 acres of desert tortoise critical habitat, including more than 2,500 previously unburned acres of critical habitat.

99.     In 2020 alone, wildfires burned a total of 19% of critical habitat and 24% of the entire Red Cliffs NCA and Desert Reserve.

100.     Some of these wildfires burned very hot, decimating native trees, shrubs, forbs and grasses to ash.  Based on the severity of these fires, it is not known how long—if ever—the vegetation will take to return to pre-burn conditions.

101.     In addition, 18 human-caused fires burned an additional 234 acres in and around

the Red Cliffs NCA and Desert Reserve in 2020.

102.     On July 21, 2020, Plaintiffs requested BLM and FWS pause the environmental review of the Northern Corridor Highway and associated actions until the agencies fully assessed and examined the full ecological impacts of these fires and complete burned area assessments and response plans.  On July 27, 2020, the agencies responded to this request, but did not agree to pause the environmental review.

**H.     Final Environmental Impact Statement**

103.     On November 12, 2020, BLM and FWS issued a Final Environmental Impact Statement for the Northern Corridor Highway and associated actions. The Final Environmental Impact Statement carried forward the identical alternatives from the Draft Environmental Impact Statement, and again identified Utah Department of Transportation's Northern Corridor route as the proposed action.

104.     The Final Environmental Impact Statement disclosed that the Northern Corridor Highway would directly impact native and nonnative vegetation communities, including the complete removal of plants, soil destruction, root compaction, and trampling.  It identified probable indirect impacts, including increased spread of nonnative, exotic species up to one kilometer from the Northern Corridor Highway, further exacerbating the fire cycle within the Red Cliffs NCA and Desert Reserve.  In total, the Final Environmental Impact Statement determined that issuing the right-of-way would directly harm 299 acres of vegetation and indirectly harm up to 3,991 acres.  Full implementation of all actions (including actions permitted under the 2020 Habitat Conservation Plan) would impact over 66,000 acres of vegetation.

105.     The Final Environmental Impact Statement also concluded that the Northern

Corridor Highway would cause the direct loss of 275 acres of tortoise habitat within the right-of-way and indirectly impact 2,333 acres of habitat, contributing to increasing fragmentation of tortoise habitat within the Red Cliffs NCA.  In addition, the Final Environmental Impact Statement concluded that the Northern Corridor Highway would permanently eliminate at least 276 acres of desert tortoise critical habitat, fragmenting and degrading at least an additional 2,619 additional acres of critical habitat, and injuring or killing at least 10% of adult desert tortoise and 50% of juveniles and hatchlings.

106.    The Final Environmental Impact Statement concluded that construction of the Northern Corridor Highway would also directly encroach on three parcels acquired through the Land and Water Conservation Fund. The Final Environmental Impact Statement failed to assess the indirect impacts of the Northern Corridor Highway on the other 12 parcels acquired through the Land and Water Conservation Fund, however.

107.    The Final Environmental Impact Statement documented that the Northern Corridor Highway would also encroach, fragment and degrade lands acquired through Section 6 of the ESA (Section 6 lands), even though these lands are required to be managed as a "wildlife preserve" for the desert tortoise and other wildlife.  More specifically, the Final Environmental Impact Statement concluded that Utah Department of Transportation's proposed Northern Corridor Highway route would result in the violation of the conservation goals on three parcels of Section 6 lands, and violate the terms and conditions of the acquisition grant agreements.

108.    The agencies did not identify any transfer or replacement lands—as required under Section 6 of the ESA—to offset or mitigate the adverse impacts on these Section 6 lands, and the Final Environmental Impact Statement included no analysis of the ecological values and opportunities of the replacement lands against the existing Section 6 lands degraded by the

Northern Corridor Highway.

109.    The Final Environmental Impact Statement also concluded that the Northern

Corridor Highway would "dramatic[ally] change" the recreational experience and resources

within the Front Country Recreation Management Zone, finding that the Northern Corridor

Highway would cause a "stark or obvious visual change to the natural setting," and "[u]sers

would also experience more frequent highway noise," which could "degrad[e] the user

experience, especially non-motorized users [who] may expect a more natural desert setting in the

Front Country [Recreation Management Zone]."

110.    In addition, the Northern Corridor Highway would cause alteration or closure of

portions of six non-motorized, two-track trails in the Red Cliffs NCA, and four proposed single-

track and two-track trails.

111.    The Final Environmental Impact Statement also determined that granting Utah

Department of Transportation's Northern Corridor Highway right-of-way would adversely affect

historic properties located within the Red Cliffs NCA, directly impact cultural resources, and

cause permanent or long-term effects to archaeological sites eligible for listing on the National

Registry of Historic Preservation.

112.    Additionally, the Final Environmental Impact Statement identified a series of

other projects in the area—including 11 road and transportation projects, the proposed Lake

Powell pipeline, and others—that collectively will harm the conservation and cultural resources

within the Red Cliffs NCA, including by: adversely impacting the native vegetation

communities; increasing the spread of noxious and invasive species; exacerbating the growing

threat of wildfire across the landscape; contributing to the incremental degradation and loss of

habitat for Mojave desert tortoise; causing the incremental degradation of Section 6 lands, which

may negatively affect achievement of the long-term conservation goals informing these acquisitions; causing the demolition or relocation of significant historical and cultural resources, which may undermine the integrity and significance of these resources; and harming recreational uses by limiting access to existing trails, paths, and other recreational opportunities.

113.    In the Final Environmental Impact Statement, the agencies acknowledged the recent fires in the Red Cliffs NCA, but claimed that these fires did not represent significant new circumstances warranting a supplemental environmental review because, according to BLM and FWS, these fires are a "common occurrence" on this landscape.  The agencies provided no data on the scale, scope, extent and impacts of these fires; burn severity and mapping; desert tortoise killed, injured, or translocated; and other information needed to fully understand the ecological impacts of these fires.

114.    In addition, the Final Environmental Impact Statement failed to examine the direct and indirect noise impacts of the Northern Corridor Highway, even though the agencies anticipated a noticeable change in noise levels in and around Utah Department of Transportation's proposed route because this alternative will construct a road in a current roadless area.

115.    The Final Environmental Impact Statement also concluded that Plaintiffs' Red Hills Expressway and Couplet alternatives would meet the objectives informing the Northern Corridor Highway (*i.e.,* reducing congestion, increasing capacity, and improving east-west mobility between State Route 18 and Interstate 15) by using existing highways.  In fact, the Couplet Alternative met or exceeded the Northern Corridor Highway in achieving these objectives on six of the eight traffic metrics measured, and the Red Hills Expressway alternative similarly exceeded the Northern Corridor Highway alternative in achieving the stated objectives.

The Couplet Alternative was significantly more cost effective, and the Final Environmental Impact Statement estimated costs for the Couplet Alternative of between $22–$33 million, whereas the Northern Corridor Highway alternative would run between $81–$123 million.  The Final Environmental Impact Statement identified the costs of the Red Hills Expressway alternative as between $97–$146 million.

116.    Finally, although Utah Department of Transportation's Northern Corridor Highway route is located immediately adjacent to private residences in the Green Springs Development, the Final Environmental Impact Statement never examined the impacts of the highway on these homes and residents, including human health and safety impacts, traffic noise, litter, air and light pollution, quality of sleep, and quality of life.

**I.      NHPA Section 106 Consultation**

117.    BLM used the NEPA process to simultaneously comply with its NHPA Section 106 obligations.

118.    The Final Environmental Impact Statement adopted an Area of Proposed Effect, which is a geographic area within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, equal to a 700-foot-wide corridor along the right-of-way.  The Final Environmental Impact Statement failed to offer any explanation for its delineation of the Area of Potential Effects, and the agencies' own evidence demonstrates that this area does not fully account for the likely direct and indirect impacts of the Northern Corridor Highway.

119.    To identify historic and cultural properties within the Area of Potential Effects, BLM conducted no new cultural resource investigations and undertook no independent analysis; instead, BLM relied on existing cultural resource inventories.  According to these data, only

about 50% of the area had been previously surveyed, locating and identifying 862 prehistoric, historic and multi-component sites, and fully locating and identifying 388 historic properties eligible for inclusion on the National Registry of Historic Preservation.

120.    The Final Environmental Impact Statement concluded that construction of the Northern Corridor along Utah Department of Transportation's proposed route would result in adverse effects to these historic properties causing permanent or long-term effects through physical damage or alteration resulting in the loss of information important in history and prehistory contained within the sites.

121.    In addition, the Final Environmental Impact Statement concluded that construction along the proposed route would result in direct impacts to a prehistoric petroglyph panel, which would diminish the integrity of the property's significant historic features.

122.    On June 8, 2020, the Cultural Preservation Offices for the Hopi Tribe contacted BLM to request that BLM deny Utah Department of Transportation's right-of-way application. The Tribe indicated that the area subject to the application and land use plan amendments contains cultural resources significant to the Tribe, and that BLM's undertaking would adversely affect these resources.  The Tribe requested a hard-copy of the Draft Environmental Impact Statement, and requested BLM initiate or fund a Hopi Traditional Cultural Properties study and analysis.

123.    Upon information and belief, BLM never responded to this correspondence, failed to send the Draft Environmental Impact Statement to the Hopi Tribe, and never funded or initiated the requested cultural study.

124.    On October 5, 2020, the Hopi Tribe again reached out to BLM, again requesting a copy of the Draft Environmental Impact Statement and associated cultural resource information.

The Tribe reiterated its request for the initiation of a Hopi Traditional Cultural Properties study.

125.    Upon information and belief, BLM never responded to this correspondence, failed to send the Draft Environmental Impact Statement to the Hopi Tribe, and never funded or initiated the requested cultural study.

**J.      Record of Decision**

126.    On January 15, 2021, then Secretary of Interior Bernhardt signed a Record of Decision completing the NEPA and NHPA consultation process and approving the issuance of a right-of-way for construction and operation of the Northern Corridor Highway along Utah Department of Transportation's preferred route, together with amendments to the Red Cliffs and St. George Field Office resource management plans.

127.    In the Record of Decision, BLM asserted that it would continue the Section 106 consultation process to resolve any adverse effects to historic properties.  Upon information and belief, BLM has yet to complete its Section 106 consultation and resolve its adverse effects determination.

**K.      Washington County's 2020 Restated and Amended Habitat Conservation Plan and Incidental Take Permit**

128.    At this same time, Washington County submitted to FWS an application for a renewed incidental take permit.  The requested incidental take permit would authorize take of the desert tortoise for an additional term of 25 years, associated with the Restated and Amended Washington County Habitat Conservation Plan (2020 Habitat Conservation Plan).

129.    Washington County adopted and approved the final 2020 Habitat Conservation Plan on or around October 2020.  In the 2020 Habitat Conservation Plan, Washington County proposed to provide additional ESA coverage for a variety of human activities causing habitat loss on 66,301 acres of potentially-suitable and occupied tortoise habitat in Washington County,

including 200 acres of designated critical habitat within the Desert Reserve.

130.     The 2020 Habitat Conservation Plan does not identify the 200 acres of critical habitat with the Desert Reserve where this take will occur, and provides no information regarding location, ownership, number of affected parcels, or other information.  The 2020 Habitat Conservation Plan notes only that these 200 acres are currently non-federal lands within the Desert Reserve.

131.     In the 2020 Habitat Conservation Plan, Washington County identified a series of conservation measures to be implemented in Washington County to benefit desert tortoise, including expanding land acquisitions in and around the Desert Reserve; additional fencing, expanded law enforcement and community education and outreach; development protocols inside and outside the Reserve; recreational management; and pre-construction desert tortoise clearances.

132.     Additionally, in response to the approval of the Northern Corridor Highway through Zone 3 of the Desert Reserve, the 2020 Habitat Conservation Plan identifies conservation measures, including tortoise underpasses along Cottonwood Springs Road; wildfire restoration and other voluntary measures; and a new mitigation zone (i.e., Zone 6) in the Desert Reserve.  Zone 6 is non-contiguous with the Red Cliffs NCA and Desert Reserve; it is relatively small (6,813 acres) and it is unlikely to support an abundance of tortoises on its own, according to BLM.  Moreover, Zone 6 is extensively used by recreationists, and impacts from recreational use include additional trails and roads, degraded soil and vegetation, and increased raven predation.

133.     On January 12, 2021, FWS issued a Biological Opinion and Incidental Take Statement for the Amended Washington County Habitat Conservation Plan, concluding that

implementing the 2020 Habitat Conservation Plan will not jeopardize the continued existence of Mojave desert tortoise or adversely modify tortoise critical habitat.

134.     Also on January 12, 2021, FWS issued a separate Biological Opinion and Incidental Take Statement for the Northern Corridor Highway Project, also concluding that constructing, operating, and maintaining Utah Department of Transportation's Northern Corridor right-of-way will not jeopardize the continued existence of Mojave desert tortoise or adversely modify tortoise critical habitat.

135.     The very next day, FWS separately recommended issuance of an Incidental Take Permit allowing the "incidental take" of Mojave desert tortoise in and around the Desert Reserve as discussed in the 2020 Habitat Conservation Plan, and FWS issued to Washington County an Incidental Take Permit as proposed under the 2020 Habitat Conservation Plan.[4]

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Northern Corridor Right-of-Way and Red Cliffs NCA Resource Management Plan Amendments: Violation of the Omnibus Public Lands Management Act and APA)**

136.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

137.     This First Claim for Relief challenges Defendants' violation of the Omnibus Act, which requires the Secretary to manage the Red Cliffs NCA "in a manner that conserves, protects, and enhances the resources of the National Conservation Area."  42 U.S.C. § 460www(e)(1)(A).  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

---

[4]  On May 24, 2021, Plaintiffs served on Defendants and FWS a notice of intent to sue under Section 11 of the ESA, identifying a series of legal infirmities in the biological opinions, the incidental take permit and incidental take statements supporting the Northern Corridor Highway and 2020 Habitat Conservation Plan, and requesting Defendants and FWS come into compliance with the ESA.

138.     Secretary Bernhardt's approval of the Record of Decision and issuance of a right-of-way grant to Utah Department of Transportation on BLM-administered lands within the Red Cliffs NCA fails to conserve, protect, and enhance the ecological, scenic, wildlife, recreational, cultural, historic, and natural resources within the Red Cliffs NCA, including by, *inter alia*:

   a.   permanently eliminating at least 276 acres of desert tortoise critical habitat, fragmenting and degrading at least 2,619 additional acres of critical habitat, and injuring or killing at least 10% of adult desert tortoise and 50% of juveniles and hatchlings within the Northern Corridor right-of-way;

   b.   causing direct and indirect harm to general wildlife species within the Red Cliffs NCA, including both direct habitat loss and on-going habitat degradation and fragmentation;

   c.   directly and permanently harming the native vegetation communities within the Red Cliffs NCA, and promoting the spread of exotic invasive species (and, thus, exacerbating the potential for future wildfires) across the Red Cliffs NCA;

   d.   causing adverse effects to historic properties, causing permanent or long-term adverse effects to archaeological sites, and directly adversely impacting a prehistoric petroglyph panel within the area of Utah Department of Transportation's Northern Corridor right-of-way;

   e.   causing long-term, adverse visual impacts to areas within the Red Cliffs NCA of high scenic quality and high visual sensitivity;

   f.   degrading the recreational and user experience across the Front Country Recreation Management Zone by creating a dramatic and stark change to the existing recreational experience, and negatively impacting access and use of

existing and proposed non-motorized trails; and

g.   increasing noise levels by constructing, operating, and maintaining a four-lane

highway, scheduled to carry up to 22,000 vehicle trips per day, including in an

area where no roadway currently exists.

139.   In addition, Defendants' approval of the Northern Corridor Highway right-of-way

as consistent with the requirements of the Omnibus Act represents an arbitrary, unexplained, and

unsupported reversal in agency position, especially because BLM reached the opposite

conclusion in the 2016 Resource Management Plan.

140.   For the foregoing reasons, the Court should hold that Defendants' approval and

grant of a right-of-way authorization to Utah Department of Transportation and adoption of the

Red Cliffs Resource Management Plan amendments through the Record of Decision is arbitrary,

capricious, an abuse of discretion, and not in accordance with law under the Omnibus Public

Land Management Act and the APA, and therefore must be reversed, set aside, and vacated

under the APA, 5 U.S.C. § 706(2)(A), (D).  These challenged actions have caused or threaten

serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members

and staff.

WHEREFORE, Plaintiffs pray for relief as requested below.

## SECOND CLAIM FOR RELIEF
**(Northern Corridor Right-of-Way and Red Cliffs NCA Resource Management Plan
Amendments: Violation of the Land and Water Conservation Fund Act and APA)**

141.   Plaintiffs reallege and incorporate by reference all preceding paragraphs.

142.   This Second Claim for Relief challenges Defendants' violations of the Land and

Water Conservation Fund Act, which requires Defendants to manage lands acquired through the

Land and Water Conservation Fund in a manner consistent with the purposes informing the

acquisition.  54 U.S.C. §§ 200301–310; Pub. L. No. 88-578; *see also Perez*, 2014 WL 3019165 at *10.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

143.    As noted above, BLM acquired 15 parcels within the Red Cliffs NCA using the Land and Water Conservation Fund, for the purposes of protecting and preserving habitat for the Mojave desert tortoise and recreational opportunities.  In approving the construction, operation, and maintenance of the Northern Corridor Highway on lands acquired through the Land and Water Conservation Fund, Defendants have undermined the purposes guiding these acquisitions, including by, *inter alia*:

a.  promoting the spread and expansion of nonnative plant species outside the immediate right-of-way, which is known to reduce desert tortoise forage quality and increases the risk of fire within tortoise habitat;

b.  promoting habitat fragmentation and physical barriers to movement which may reduce habitat connectivity, significantly decreasing gene flow among tortoise populations and potentially increasing genetic isolation;

c.  increasing vibration, noise, and lights, which are known to have potentially significant effects on desert tortoise behavior, communication and hearing, and may affect tortoise foraging, breeding and sheltering behavior, leading to poor health, reduced breeding success, or increased risk of mortality;

d.  increasing vulnerabilities of desert tortoise to effects of ground-disturbing activities, including crushing, entombing in burrows and dens, increased vandalism and collection, and fragmenting habitats, and causing direct mortality;

e.  increasing human activity in and around tortoise habitat, which may facilitate

expansion of raven and coyote populations into areas impacted by the Northern

Corridor Highway, causing increased predation on tortoise; and

f.   degrading the recreational and user experience across the Front Country

Recreation Management Zone by creating a dramatic and stark change to the

existing recreational experience, and negatively impacting access and use of

existing and proposed non-motorized trails.

144.   For the foregoing reasons, the Court should hold that Defendants' approval and

grant of a right-of-way authorization to Utah Department of Transportation and adoption of the

Red Cliffs Resource Management Plan amendments through the Record of Decision is arbitrary,

capricious, an abuse of discretion, and not in accordance with law under the Land and Water

Conservation Fund Act and the APA, and therefore must be reversed, set aside, and vacated

under the APA, 5 U.S.C. § 706(2)(A), (D).  These challenged actions have caused or threaten

serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members

and staff.

WHEREFORE, Plaintiffs pray for relief as requested below.

### THIRD CLAIM FOR RELIEF
**(Northern Corridor Right-of-Way, Red Cliffs NCA & St. George FO Resource Management Plan Amendments: Violation of NEPA and APA)**

145.   Plaintiffs reallege and incorporate by reference all preceding paragraphs.

146.   This Third Claim for Relief challenges Defendants' violations of NEPA, 43

U.S.C. §§ 4321 *et seq.*, and its implementing regulations, 40 C.F.R. §§ 1500 *et seq.*, in approving

the Record of Decision, granting the Northern Corridor right-of-way, and approving the Red

Cliffs NCA and St. George FO Resource Management Plan amendments.  This claim is brought

pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

147.    As alleged in more detail above, NEPA requires that federal agencies take a "hard look" at all direct, indirect, and cumulative impacts of their proposed actions, using high-quality information, accurate scientific analyses, and scientific integrity. Defendants violated these requirements by relying on the Draft Environmental Impact Statement and the Final Environmental Impact Statement that failed to take a "hard look" at the impacts of the Northern Corridor Highway and associated Resource Management Plan amendments, including by, *inter alia*:

a.  failing to fully examine and disclose the direct impacts of the Northern Corridor Highway, including the impacts of increased noise on the Mojave desert tortoise and other wildlife, as well as the scenic and recreational resources within the Red Cliffs NCA and the adjacent community of Green Springs;

b.  failing to fully examine and disclose the indirect impacts of the Northern Corridor Highway on the Mojave desert tortoise and other wildlife, as well as the ecological, scenic, recreational, cultural, historic, and natural resources within the Red Cliffs NCA; and instead relying on cramped indirect analysis areas that ignored the full scope of the impacts of the Northern Corridor Highway and associated actions;

c.  failing to fully examine and disclose the possible growth inducing impacts of constructing the Northern Corridor Highway, including possible residential and/or commercial development on private, State and municipally-owned lands in the eastern portions of the Red Cliffs NCA;

d.  failing to fully examine and disclose the cumulative impacts of constructing, operating, and maintaining the Northern Corridor Highway; and

e.   failing to establish accurate baseline data on the impacts of recent wildfires on

Mojave desert tortoise populations and habitat, as well as burgeoning non-native

vegetation communities across the Red Cliffs NCA.

148.    For the foregoing reasons, the Court should hold that the Final Environmental

Impact Statement violated NEPA and that Defendants' approvals of the Northern Corridor

Highway right-of-way and the Red Cliffs NCA and St. George Field Office Resource

Management Plan amendments based on the inadequate Final Environmental Impact Statement

are arbitrary, capricious, an abuse of discretion, not in accordance with NEPA and the APA, and

therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D).

These challenged actions have caused or threaten serious prejudice and injury to the rights and

interests of Plaintiffs and their supporters, members and staff.

WHEREFORE, Plaintiffs pray for relief as requested below.

## FOURTH CLAIM FOR RELIEF
### (Northern Corridor Right-of-Way & Red Cliffs NCA Resource Management Plan Amendments: Violation of NEPA and APA)

149.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

150.    This Fourth Claim for Relief challenges Defendants' violation of NEPA and its

implementing regulations due to their refusal to prepare a supplemental environmental impact

statement to examine the impacts of four major wildfires in the Red Cliffs NCA (Turkey Farm

Road, Cottonwood Trail, Lava Ridge and Snow Canyon fires) on Mojave desert tortoise

populations and habitat, native and non-native vegetation communities, and other resources

within the Red Cliffs NCA.  This claim is brought pursuant to the judicial review provisions of

the APA, 5 U.S.C. § 706.

151.    NEPA requires an agency to prepare a supplemental environmental impact

statement when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(d)(1)(ii).  As discussed *supra*, after BLM issued its Draft Environmental Impact Statement, four major wildfires burned nearly 15,000 acres within the Red Cliffs NCA, and 18 human-caused fires burned an additional 234 acres within the Red Cliffs NCA.

152.    The available information shows these fires burned nearly 9,000 acres of tortoise critical habitat, including nearly 2,500 acres that were previously unburned.  In total, in 2020 alone, wildfires burned a total of 19% of critical habitat and 24% of the entire Red Cliffs NCA and Desert Reserve.

153.    Yet, Defendants refused to prepare a supplemental environmental impact statement to consider the impacts of these fires on desert tortoise populations and habitat, native and non-native vegetation communities and other resources across the Red Cliffs NCA.  Indeed, the agencies refused to even consider, cite, or examine BLM's own initial review of tortoise mortality associated with the Cottonwood Trail Fire, which found the remains of 14 tortoises incinerated in the fire across just 618 surveyed acres.

154.    The impacts of these wildfires in and around the Red Cliffs NCA and Desert Reserve will likely be amplified based on the breadth and scope of non-native, invasive species already taking hold in the Red Cliffs NCA.  Given this significant new information, Defendants were required to prepare and circulate a supplemental environmental impact statement prior to adopting the Record of Decision.

155.    Accordingly, the Court should hold that Defendants' Record of Decision approving the Northern Corridor Highway right-of-way and the Red Cliffs NCA Resource Management Plan amendments without first preparing a supplemental environmental impact

statement was arbitrary, capricious, an abuse of discretion, not in accordance with NEPA and the

APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. §

706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to

the rights and interests of Plaintiffs and their supporters, members and staff.

### FIFTH CLAIM FOR RELIEF
**(Northern Corridor Right-of-Way, Red Cliffs NCA & St. George FO Resource
Management Plan Amendments: Violation of the NHPA and APA)**

156.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

157.    This Fifth Claim for Relief challenges Defendants' approval and issuance of the

Northern Corridor right-of-way, and Red Cliffs NCA and St. George Field Office Resource

Management Plan amendments for violating of the NHPA and its implementing regulations,

which require federal agencies to complete Section 106 consultation prior to approving a federal

undertaking.  This claim is brought pursuant to the judicial review provisions of the APA, 5

U.S.C. § 706.

158.    Issuance of the Northern Corridor right-of-way and the Red Cliffs NCA and St.

George Field Office Resource Management Plan amendments constitute undertakings pursuant

to the NHPA that have the potential to affect historic properties.

159.    Defendants' Section 106 processes for the Northern Corridor right-of-way and the

Red Cliffs NCA and St. George Field Office Resource Management Plan amendments violated

the NHPA in the following ways, each of which is a distinct and separate violation of law:

   a.  the Area of Potential Effects for the Northern Corridor right-of-way and the Red

       Cliffs NCA Resource Management Plan amendments was arbitrarily defined and

       excluded many historic properties that could be affected by the undertakings;

   b.  Defendants failed to make a reasonable and good faith effort to identify historic

properties within the Area of Potential Effects prior to approving and issuing the
Northern Corridor right-of-way and the Red Cliffs NCA Resource Management
Plan amendments;

c.  Defendants failed to resolve prior to issuing the Record of Decision their
determination that construction, operation, and maintenance of the Northern
Corridor Highway will adversely affect cultural and historic properties within the
Area of Potential Effects; and

d.  Defendants failed to complete their Section 106 responsibilities before reaching a
final decision on the Northern Corridor right-of-way, and Red Cliffs NCA and St.
George Field Office Resource Management Plan amendments recorded through
the January 2021 Record of Decision.

160.    Each of these failures was arbitrary, capricious, an abuse of discretion, and a
violation of law, and these failures, in turn, prevented BLM from taking further steps required
under the NHPA, such as identifying avoidance or mitigation measures.

161.    For the foregoing reasons, the Court should hold that Defendants' approval and
grant of the Northern Corridor right-of-way, and the Red Cliffs NCA and St. George Field Office
Resource Management Plan amendments is arbitrary, capricious, an abuse of discretion, and not
in accordance with law under the NHPA, APA, and their implementing regulations.  These
challenged actions have caused or threaten serious prejudice and injury to the rights and interests
of Plaintiffs and their supporters, members and staff.

WHEREFORE, Plaintiffs pray for relief as requested below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

(1)     Order, adjudge and declare that Defendants violated the Omnibus Public Land Management Act, the Land and Water Conservation Fund Act, the National Environmental Policy Act, the National Historic Preservation Act, the Administrative Procedure Act, and/or their implementing regulations in adopting the Record of Decision, approving and granting the Northern Corridor right-of-way, and approving the Red Cliffs NCA and St. George Field Office Resource Management Plan amendments ;

(2)     Reverse, hold unlawful, set aside, and vacate the issuance of the Northern Corridor right-of-way, and the Red Cliffs NCA and St. George Field Office Resource Management Plan amendments;

(3)     Enter such preliminary and/or permanent injunctive relief as Plaintiffs may specifically request hereafter;

(4)     Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and/or

(5)     Grant such other and further relief as the Court deems just and proper.

Dated: June 3, 2021                      Respectfully submitted.

                                         /s/ Todd C. Tucci
                                         Todd C. Tucci (DC Bar # ID0001)
                                         ADVOCATES FOR THE WEST
                                         P.O. Box 1612
                                         Boise, ID 83702
                                         (208) 342-7024
                                         ttucci@advocateswest.org

                                         *Attorneys for Plaintiffs*